## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 10-62028-SCOLA/ROSENBAUM

CLENA INVESTMENTS, INC.,
d/b/a Shoppes of Oakland,

           Plaintiff,

v.

XL SPECIALTY INSURANCE CO.,

           Defendant.

_____/

## __ORDER__

This matter comes before the Court on Defendant's Amended Motion to Strike Plaintiff's Expert [D.E. 54], upon referral by the Honorable Robert N. Scola, Jr., for disposition [D.E. 68]. The Court has carefully reviewed the pending Motion, all filings in support thereof and in opposition thereto, and the record in this case, and has held an evidentiary hearing on the Motion on January 27, 2012. Based on its consideration of these materials and being otherwise duly advised in the premises, the Court now grants in part and denies in part Defendant's Amended Motion to Strike Plaintiff's Expert, as set forth below.

### *I.  Background*

This case arises out of an insurance dispute between Plaintiff Clena Investments, Inc. ("Clena"), and Defendant XL Specialty Insurance Co. ("XL"). In the Complaint, Clena alleges that on October 24, 2005, it sustained damages to a property that was insured by XL (the "Property"). *See* D.E. 1-1 at 3-4. Although the Complaint itself does not specifically identify the source of the alleged damage, Clena's later filings in the case attribute the damages to Hurricane Wilma.

According to the Complaint, XL improperly denied Clena's insurance claim for damages.

Therefore, Clena filed this action in the Circuit Court for the Seventeenth Judicial Circuit in and for Broward County, Florida.  *See* D.E. 1-1.  XL subsequently removed the case, invoking diversity jurisdiction under 28 U.S.C. § 1332.  *See* D.E. 1.

During the course of discovery, at XL's request, EFI Global ("EFI") conducted an investigation into the origins and causes of damages to the Property.  *See* D.E. 57-1.  In its report, EFI explained that Richard N. Harb, P.E.,[1] had "conducted an origin and cause damage investigation" at the Property.  *Id.* at 1.  Based on Harb's investigation, EFI opined that only roughly ten square feet of the roof displayed indications consistent with wind damage, constituting "about 0.1 percent of the damage . . . ."  *Id.* at 8.  The bulk of the damage, which pertained to approximately fifty percent of the roof, was consistent with "normal long term deterioration caused by wear and tear."  *Id.* at 1.  EFI estimated the roof to be the original roof installed in 1984.  *See id.* at 1, 5.  EFI also attributed some of the damage to "poor roof installation,"  "settlement," and "expansion and contraction damage caused by temperature differentials."  *See id.* at 7-8.  Ultimately, EFI concluded that the Property's roof was "expired . . . [and that it had] exceeded its useful life expectancy."  *Id.* at 8.

EFI explained that its report and conclusions were "based on visual inspection of the damages at the . . . [Property].  No destructive investigation was performed.  No mold investigation was performed.  The construction drawings were not reviewed . . . .  The observations and recommendations [were] based only on the visible portions of the structure.  No repair receipts were made available to EFI for review."  *Id.* at 2.  A review of the report also shows that EFI considered

---

[1]"P.E." stands for "professional engineer."

certain Florida Building Code requirements, meteorological information obtained from the websites of the National Weather Service Forecast Office ("NWS") and the National Oceanic and Atmospheric Administration ("NOAA"), and information from the National Roofing Contractors Association ("NRCA"). EFI's report itself appears to set forth all information that EFI obtained from these sources and relied upon in its report.

In response to EFI's report, Clena engaged Vandin Calitu to review and opine on EFI's report and on the probable cause of the damage to the Property. *See* D.E. 50-1 at 52:16 - :25.[2] He also looked at and remarked on repair-cost estimates that were submitted to him for review. *Id.*

Calitu, a professional engineer licensed in Florida, majored in building-construction engineering and graduated from Bucharest Technical University with his Bachelor-of-Science degree. D.E. 50-2 at 14.[3] He later earned his Master-of-Science degree in civil engineering from the University of Miami. *Id.* Since 1997, Calitu has worked as an engineer, serving as a project manager on various design and construction projects since 1997. *See id.* at 14-15. In this capacity, Calitu must account for potential hurricane-force wind impact when building a construction project. He testified during the evidentiary hearing on January 27, 2012, that he ensures building compliance with the Hurricane Code requirements, designed to allow buildings to withstand Category V

---

[2]D.E. 50-1 is the transcript of Calitu's deposition. The number appearing immediately to the left of the colon in the citation represents the page number of the deposition transcript, not the page number imprinted by the Court's CM/ECF system across the top of the filing. The number appearing immediately to the right of the colon indicates the line number.

[3]Some docket entries, including this one, have more than one page-numbering system, resulting in different page numbers on the same page: the page number of the original document and the page number imprinted across the top of the page by the Court's CM/ECF system. Except as otherwise indicated, *see, e.g.*, note 2, *supra*, this Order refers to the page numbers left by the Court's CM/ECF system.

hurricane winds.  In addition to working as a project manager for Malcolm Pirnie (Calitu's current employer), CH2M Hill, CDM, and an engineering firm in Romania at different times, for the past approximately five years, Calitu has also engaged in work as a litigation expert and as a consultant outside of his other employment.  *See* D.E. 50-1 at 6:16 - 9:5; 29:3 - :11.

As Calitu describes his work experience, he has dealt with all disciplines of engineering and has developed a particular expertise in the area of heating, ventilation, and plumbing and in geotechnical engineering.  *Id*. at 21:3 - :10; 21:22 - 22:17; 26:1 - :5.  According to Calitu, he "work[s] a lot with all sorts of construction companies down here in South Florida, . . . general contractors, roofers, . . . , pretty much all disciplines, piping."  *Id.* at 21:3 - :10.  "[O]n the side," Calitu has also conducted "roof investigations."  *Id.* at 39:16 - 40:2.

In working on this case, Calitu reviewed EFI's report, including the meteorological and other information contained therein; a cost estimate and amended cost estimate for restoration, service, and remodeling prepared by Freedom Adjusters, LLC; and photographs with moisture readings taken by Clena's public adjuster, Ivan Maldonado, in February 2010.  D.E. 60-2 at 1.  In addition, Calitu visited the Property in July 2011, went up on the roof and visually inspected and photographed it, and spoke with two tenants of the Property who had claimed that Hurricane Wilma left "a bunch of debris . . . on the roof[,] . . . and there was a tree that fell on the roof [in connection with Hurricane Wilma]."  D.E. 50-1 at 42:10 - 43:1; 44:4 - :9; 48:18 - :22; 49:5 - 52:7.  These tenants also took Calitu inside the Property and showed him water damage.  *Id.* at 50:25 - 51:8.

Based on his investigation, Calitu opined, in relevant part,

> [T]he existing damages of the roof and, in turn, the interior leaks, are likely due to high winds activity in recent years[.]  Hurricane Wilma likely caused the existing roof damages and interior leaks at the

Property.  The effect of such winds on the parapet wall[4] flashing and edge roof membrane and also on the air plenums[5] and air condensing units created the proper conditions for water and air intrusion under the roof membrane.  Continuous water and air infiltration has been undermining the membrane, metal deck and overall roof structure.

At this time, without any documentation, the exact extent of destruction on this roof immediately after a category 2 or up hurricane and the ongoing deterioration thereafter would be quite impossible to estimate.  However, the initial cause of damage due to high winds and windborne debris could not be ruled out.

It is difficult to isolate the roof damages to a particular hurricane event in the last few years, either Katrina, Frances, Irene, Wilma, etc. However, based on several factors and recorded data (presented in Table 1 below) that I researched, it is my personal opinion that the probability that hurricane Wilma affected the subject roof is much higher than that of hurricane Franc[e]s.

**Table 1 — Facts Comparison between Hurricanes FRANCES and WILMA**

| No. | Data/Fact | Source | Hurricane FRANCES | Hurricane WILMA |
|-----|-----------|--------|-------------------|-----------------|
| 1 | Storm strength at landfall in South Florida | NHC | Category 2 | Category 3 |
| 2 | Winds Gusts in Florida | NHC | 87 MPH | 135 MPH |
| 3 | Damage Costs in Florida | FEMA | $2.1 billion | $20.6 billion |
| 4 | Most Affected Areas | FEMA | Florida, Georgia | Florida |

---

[4]As Calitu used the term "parapet wall," he was referring to a "wall that goes around the perimeter of the roof."  D.E. 50-1 at 100:14 - :17.  Calitu described the parapet wall at the Property to be "[t]hree or four feet tall from the top of the roof" and to "run[] along the entire perimeter of the roof."  *Id.* at 100:14 - :23.

[5]In employing the term "plenums," Calitu explained that he was referring to the box that contains the duct joints for the air-condensing system that connect through the roof of the building.  *See* D.E. 50-2 at 101:2 - 102:12.

| 5 | Mobile Homes Affected in Broward County | FLHSMV | None | 800 |
|---|---|---|---|---|
| 6 | Conversation with eye witness from subject property | | No roof damage after the storm was observed | Roof damages were observed after the storm |

> Based on the factual data presented in Table 1 above, one could conclude that it is highly probable that the wind damages on the subject roof are associated with Hurricane Wilma rather than Frances.
>
> * * * * *

*See* D.E. 60-2 at 4. In his deposition testimony and his testimony during the January 27, 2012, evidentiary hearing, Calitu explained that his conclusion that Hurricane Wilma, not Hurricane Frances, inflicted the damage also stemmed from his reasoning that had the current extent of cracking and holes in the roof membrane existed when Hurricane Frances occurred, the roof membrane would have been peeled off by Hurricane Wilma. Calitu further concluded in his written report that the total costs for roof replacement and interior structural remedial activities would amount to $281,400.00. *See id.* at 5.

Finally, Calitu took issue with certain aspects of EFI's report. Among others, Calitu criticized as "speculative" EFI's assessment that the roof was approximately 26 years old because EFI did not indicate that it had consulted any evidence that would have dated the roof. Calitu further noted the absence in EFI's report of any specific reference to the impact in the analysis of the parapet wall of the roof and of the twelve roof-top-mounted air-condensing units sitting on the otherwise-flat roof. *See* D.E. 60-2 at 2. According to Calitu, significant damage to the parapet wall was consistent with "high winds when flying debris would repeatedly hit the parapet wall." *Id.* Calitu opined that EFI had "conveniently omitt[ed] the deterioration of the parapet wall perimeter flashing and

membrane" in concluding that only ten square feet of the Property's roof had been damaged by high winds. *Id.* at 3. With regard to the air-condensing units on the roof, Calitu remarked that hurricane winds could have had a "major impact": "Being anchored to the roof (on concrete pads) and sealed around with the roofing membrane, any torquing, dislocation, uplift, movement, etc. of the air condensing units would result in roof damages in the area." *Id.* In sum, Calitu commented about EFI's conclusion that only ten square feet of roofing were damaged by high winds, "Without detailed, penetrative and/or destructive investigative methods, [EFI's] findings of such minute percentage of wind damage are quite impressive, but mostly questionable." *Id.*

EFI subsequently prepared a supplemental report. *See* D.E. 60-1. Among other things, EFI reported that after conducting research, it had determined that the Property had received a new roof in 1993, so at the time that Wilma struck, the roof was actually twelve years old, not twenty years old, as it had originally opined. *See* D.E. 60-1 at 4. It continued, however, to disagree with Calitu's conclusions regarding the cause of damage to the roof, concluding that the parapet wall had actually shielded the roof surface from the direct force of the wind. *Id.* In addition, EFI insisted that any damage to the roof around the air-condensing units was not caused by wind. *Id.*

Along with its Motion for Summary Judgment [D.E. 51], XL filed its Amended Motion to Strike Plaintiff's Expert ("Amended Motion") [D.E. 54].[6] In its Amended Motion, XL seeks to strike Calitu and his report and deposition testimony from the record. XL originally took issue with Calitu's qualifications and determinations, complaining that

_____

[6]This Court denied as moot Plaintiff's original Motion to Strike Plaintiff's Expert [D.E. 53] in light of Plaintiff's filing of its Amended Motion to Strike Plaintiff's Expert [D.E. 54], which is identical to Plaintiff's original Motion, except that it includes the required Certificate of Good-faith Conferral. *See* D.E. 69.

7

1)    . . . Calitu lacks the expertise to provide expert testimony about wind speeds at the insured property, whether the insured building was damaged by wind, and when any damages at the insured property occurred;

2)    . . . Calitu's opinions are not the product of reliable scientific methodologies;

3)    . . . Calitu did not base his opinions upon sufficient and reliable facts and data; and

4)    . . . Calitu's opinions are lay, not expert, opinions and will not assist a lay trier of fact in determining whether the insured property sustained covered damage during the effective period of the policy, and if so, the amount of that damage.

D.E. 54 at 2. At the evidentiary hearing, however, XL conceded that Calitu possessed the requisite qualifications to opine that wind had inflicted the damage to the Property. XL further clarified that it is not challenging the reliability of the methods Calitu used in opining that wind had damaged the Property, nor is it objecting to the helpfulness of Calitu's opinion in this regard. Instead, during the hearing, XL focused its arguments on Calitu's qualifications to determine that it was more likely that Hurricane Wilma had caused the damage than that any other hurricane had. XL also argued that the methodology that Calitu used to conclude that Hurricane Wilma was most probably responsible for damaging the roof of the Property is neither reliable nor helpful and urged the Court to preclude Calitu from rendering such an opinion. Finally, XL explained that it also challenges Calitu's opinion that the cost of repairing damage endured by the Property as a result of Hurricane Wilma amounts to $281,400. As XL expounded, however, it does not take issue with the value of the damages; rather, XL objects only to that aspect of Calitu's opinion attributing the $281,400 in damages to Hurricane Wilma. XL specified that it does not challenge any other aspect of Calitu or his proposed testimony.

8

In response, Clena argues that, as a professional engineer who personally examined the property, evaluated the materials prepared by Clena's public adjuster, reviewed the applicable weather reports, and applied his observations in light of his professional training and experience, Calitu is qualified to render his expert opinion and to critique the report that XL's retained expert, EFI, prepared.  *See* D.E. 72 at 3.  Rather than disqualify Calitu as an expert, Clena urges, at most, the alleged deficiencies that XL raises pertain only to the weight and credibility that the fact-finder should afford Calitu's opinions, not to their admissibility.  *Id.*

The Honorable Robert N. Scola, Jr., referred Defendant's Amended Motion to me for disposition.  *See* D.E. 68.  The matter is now ripe for resolution.

## II. Analysis

Rule 702, Fed. R. Evid., governs the admissibility of expert testimony.  It provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Under this rule, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).  In determining whether expert testimony and any report prepared by the expert may be admitted, the Court engages in a "rigorous" three-part inquiry into whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions

is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993))). The Eleventh Circuit refers to these requirements as the "qualifications, "reliability," and "helpfulness" prongs, respectively. *Id.*; *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) ("*Quiet Tech.*"). While some overlap exists among these requirements, the court must individually analyze each concept. *Frazier*, 387 F.3d at 1260.

Under *Daubert*, the court acts as a gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Instead, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). But in so doing, the district court must take care not to "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341; *Maiz*, 253 F.3d at 666 (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999)). Thus, the district court cannot exclude an expert because it believes that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293, n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

Here, Defendant challenges on all three prongs of the *Daubert* test the expert testimony of

10

Calitu and his Report and deposition testimony as they relate to Calitu's opinion that the wind-inflicted damage to the Property probably occurred as a result of Hurricane Wilma.  The Court separately considers each prong.

**A.**   **Calitu's Qualifications**

An expert may be qualified "by knowledge, skill, experience, training, or education." *Furmanite Am., Inc. v. T.D. Williamson*, *Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (citing Fed. R. Evid. 702).  Moreover, "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id.* (citing *Maiz*, 253 F.3d at 665).  Where an expert does have congruent experience, "[t]he Committee Note to the 2000 Amendments of Rule 702 . . . explains that '[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony.'" *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 Advisory Committee's note (2000 amends.)).

Determining whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1314-16 (N.D. Ga. 2002).  In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address.  *City of Tuscaloosa*, 158 F.3d at 562-63.  This inquiry is "'not stringent,' and 'so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (citations omitted); *Johnson v. Big Lots Stores, Inc.*, 2008 WL 1930681, *14 (E.D. La. Apr. 29, 2008) (summarizing *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 n.10 (5th Cir. 1999), as "explaining that after an individual

satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination"); *see also Martinez v. Altec Indus., Inc.*, 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005) (quoting *Rushing,* 185 F.3d at 507 ("As long as some reasonable indication of qualifications is adduced, . . . qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity"), *superseded by rule on other grounds as recognized in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002)).  After the district court undertakes a review of all of the relevant issues and an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion. *See Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5 h Cir. 1976).[7]

Turning to Defendant's Amended Motion to Strike, the Court has reviewed Calitu's résumé and his deposition testimony further detailing his prior experience as a professional engineer.  The Court has also considered the scope of Calitu's report and EFI's report.  In addition, the Court has considered the evidence adduced during the January 27, 2012, *Daubert* hearing, as well as XL's concession that Calitu is qualified to identify wind-inflicted damage.  Based on these factors, the Court agrees that Calitu possesses sufficient qualifications to testify that damage to the Property was caused by hurricane-force winds and to opine on the correctness of EFI's conclusions regarding the same issue.  The Court further finds that contrary to XL's suggestion, Calitu also possesses sufficient education, training, and experience to opine that Hurricane Wilma more likely caused the damage to the Property than Hurricane Frances or any other preceding hurricane because had the roof suffered from the same of extent of damage that it does now when Hurricane Wilma hit, Hurricane

---

[7]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding all decisions the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

Wilma would have ripped the membrane from the roof.

Calitu appears to possess an appropriate educational and professional background to serve as an expert in these subject areas.  In furtherance of obtaining his professional engineer's license, Calitu graduated with both an undergraduate and a graduate degree in engineering.  He has also actually worked as a practicing civil and structural engineer for fourteen years.  As a professional engineer, Calitu has directed numerous construction projects as the project manager.  In this capacity, he has worked with, among others, roofing contractors, and he, as a part of his "side" business, has conducted roof investigations.  He has further been responsible for ensuring building-construction compliance with the Hurricane Code.  Notably, Calitu possesses precisely the same professional license as Harb, who conducted EFI's investigation in this case for XL.  This is not surprising, as assessing structure-related damages to a building would seem to be a natural fit with the training and experience that a professional civil engineer has.  *See, e.g., Broussard v. State Farm Fire & Cas. Ins.*, 523 F.3d 618, 631 (5th Cir. 2008) (affirming district court's ruling allowing structural engineer to testify that storm surge and not hurricane-force winds caused damage); *cf. also Traveler Indem. Co. of Conn. v. Centimark Corp.*, 2010 WL 3431159, *2 (S.D. Fla. Aug. 30, 2010) (finding licensed engineer qualified to provide expert opinion that installation of roofing system was faulty).  Presumably, XL viewed Harb's professional-engineering license as at least one relevant qualification for assessing the cause of damage to the Property before hiring EFI.  No less is true of Calitu's comparable license and experience.

Nor, as XL originally suggested in its Motion, does the fact that Calitu has not previously served as an expert witness in cases involving wind damage render him any less qualified to serve as an expert in this case.  *See* D.E. 54 at 4.  Every expert found to be qualified by a court must be so

13

designated a first time. While findings by other courts that Calitu is qualified to serve as an expert witness in the area of wind damage might help to support a finding that Calitu is qualified to opine in this case on the likely cause of the damages to the Property, the absence of such prior court determinations does not preclude the Court from concluding that Calitu is qualified here.  Rather, Calitu's education, experience, and professional background can and do, in and of themselves, satisfy the relatively low threshold established by Rule 702 and *Daubert* and its progeny to find Calitu qualified to opine on whether the possible causes of damages to the Property are consistent with hurricane damage.  *Cf. McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) (citing *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24 (1st Cir. 2003)) (a proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline); *Traveler Indem. Co. of Conn.*, 2010 WL 3431159, at *2 (rejecting argument that licensed engineer was unqualified to render expert opinion that installation of roofing system was faulty where licensed engineer lacked specific expertise in metallurgy and wood oxidation and his opinions related to the degradation of the materials used in the roof).

XL's complaints that Calitu is not an expert in determining when damage occurred or in weather are similarly unavailing.  *See* D.E. 54 at 4-5.  Calitu was not asked to date the damage; instead, Calitu has opined that the type of damages he saw at the Property are consistent with damages inflicted by hurricane-force winds and that had a hurricane preceding Wilma inflicted the damage at issue, Wilma would have caused the roof membrane to be ripped off.  Although dating the damage might be helpful to Calitu's analysis, even XL's own expert remarked, "[D]ue to the numerous numbers of storm events during the 2004 and 2005 seasons, it is inconclusive which

hurricane caused the observed damage." D.E. 57-1 at 7. As for Calitu's lack of weather expertise, Calitu need not be able to predict a hurricane to be able to identify the damages that result from one. Notably, EFI obtained its weather information relating to hurricanes in South Florida from the websites of NWS and NOAA, just as Calitu relied in his report on weather-related information on hurricanes from the National Hurricane Center. *See* D..E. 60-2 at 4. In short, Calitu's background, training, education, and professional experience as a practicing, licensed civil engineer sufficiently qualify him to opine on the causes of damages to the Property and the likelihood that a roof in the current condition of that of the Property could not have survived Hurricane Wilma. *See Quiet Tech.*, 326 F.3d at 1342-43 (finding expert qualified "by virtue of his extensive education , training and experience").

## B.    Reliability

The reliability inquiry seeks to ensure that an expert's testimony "rests on a reliable foundation." *Frazier*, 387 F.3d at 1261 (quoting *Daubert*, 509 U.S. at 597) (internal quotation marks omitted). To survive this requirement, proposed expert testimony "must be supported by appropriate validation — *i.e.*, 'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 590). In evaluating reliability in cases involving expert opinions allegedly rooted in science, the court considers, to the extent practicable, "(1) whether the expert's theory can be tested and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (quoting *Quiet Tech.*, 326 F.3d at 1341 (citations omitted)). As the Eleventh Circuit has noted, however, "[t]hese factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally

15

important in evaluating the reliability of proffered expert opinion." *Id.* (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150-52 (1999); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)).

Turning to the area of non-scientific, experience-based testimony, while these same criteria may be used to evaluate its reliability, sometimes other factors may prove more useful. *Id.* at 1262. Consequently, a district court enjoys flexibility in conducting the reliability analysis. The applicability of *Daubert* factors in assessing reliability in any "given case will depend . . . on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 150) (internal quotations omitted). Whatever the appropriate inquiry in a particular case, however, where, as here, the proposed expert's opinion relies principally upon his experience and knowledge, the Court must satisfy itself that the witness has appropriately explained how his experience leads to the conclusion he reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Id.* at 1261. "An expert's unexplained assurance that [his] opinions rest on accepted principles" is not enough. *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1130 (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005)).

Here, XL challenges the following two opinions that Calitu offers:

1.  The probability that Hurricane Wilma damaged the Property is much higher than the probability that Hurricane Frances inflicted the damages; and

2.  The total costs for roof replacement and interior structural remedial activities attributable to Hurricane Wilma would be $281,400.00.

To reach these conclusions, Calitu (1) reviewed EFI's report, including the meteorological and other

16

information contained therein on which EFI apparently relied in writing its report; (2) considered a cost estimate and amended cost estimate for restoration, service, and remodeling prepared by Freedom Adjusters, LLC; (3) looked at photographs with moisture readings taken by Clena's public adjuster, Ivan Maldonado, in February 2010; (4) visited the Property in July 2011, going up on the roof and visually inspecting and photographing it and seeing the inside of certain units where tenants showed him water damage; and (5) spoke with two tenants of the Property who had claimed that Hurricane Wilma left "a bunch of debris . . . on the roof[,] . . . and there was a tree that fell on the roof [in connection with Hurricane Wilma]."  Calitu's report and deposition testimony also reflect that Calitu reviewed information he obtained from the National Hurricane Center and the Federal Emergency Management Agency.

As a preliminary matter, the Court notes that it appears that XL's proposed expert, EFI, engaged in a very similar process.  Like Calitu, EFI conducted a visual inspection of the Property but did not perform destructive testing or a mold investigation.  Also like Calitu, EFI did not review the construction drawings for the property and instead based its recommendations "only on the visible portions of the structure."  Similarly, EFI, like Calitu, obtained meteorological information on which it relied in reaching its opinions from public websites such as those of the NWS and NOAA, as well as roofing information from the NRCA.  And neither Calitu nor EFI appears to have performed any mathematical calculations to arrive at their opinions.  *See* D.E. 50-1 at 228:8 - :19.  While EFI's methodology is not dispositive on the question of the sufficiency of Calitu's process, where EFI and Calitu — both engineers — undertook essentially the same process for evaluating the cause of damage to the Property, that fact does suggest that the methodology enjoys at least some acceptance in the engineering community.  EFI, however, concluded that it was impossible to

determine which particular hurricane caused the damage to the Property.

Therefore, turning specifically to the first opinion — that Hurricane Wilma most probably caused the damage to the Property — the Court considers Calitu's expressed rationale underlying this conclusion.  Originally, Calitu relied on the chart of six factors that he inserted into his report.  As Calitu explained, he gathered these six factors from publicly-available resources, such as FEMA and the National Hurricane Center.[8]  During the evidentiary hearing, Calitu conceded that he had not previously relied upon such a framework and that he was not aware that employing this type of analysis was generally accepted within the engineering community.  Nor did this reasoning require Calitu to use his special expertise and skills as an engineer.  This methodology similarly enjoyed no scientific basis.  For these reasons, the Court concludes that to the extent that Calitu based his opinion on the six-factor chart set forth in his report, that opinion cannot stand, and that analysis must be stricken.

The inquiry, however, does not end at this point.  During his deposition and evidentiary-hearing testimony, Calitu offered an independent reason for his conclusion that Wilma most likely inflicted the damage to the Property: that had the roof had its current level of damage before Wilma hit, Wilma would have ripped the roof-membrane off the Property.  Unlike the six-factor chart gathered from publicly-available information, Calitu's experience as an engineer and his visual inspection of the Property provide the basis under this analysis.  For the same reasons that, as XL concedes, Calitu's experience and inspection of the Property lay a permissible foundation for Calitu's conclusion that wind caused the damage to the Property's roof, they provide an acceptable

---

[8]The last factor was not obtained through a publicly-available resource, but rather was gathered through an interview with a witness to the damage.

basis for Calitu's opinion that Hurricane Wilma most probably exacted the damage at issue. More specifically, Calitu testified that, as a result of his training and experience, he knows where to look and what to look for when inspecting a property for damage, and, as a professional engineer, he understands the import of cracks and holes that an untrained person would not. He further appreciates the impact of high winds on property, having to take these effects into account when building to ensure Hurricane Code compliance. For all of these reasons, Calitu may rely upon his training, experience, and inspection of the Property to opine that it is more likely that Hurricane Wilma imposed the Property damage than that any prior hurricane did. And because XL's objection to the second opinion stems only from the fact that that opinion ties the damages to the Property to Hurricane Wilma, the Court similarly overrules XL's challenge to the second opinion set forth above.

## C.  Helpfulness

Expert testimony is helpful to the trier of fact only "if it concerns matters that are beyond the understanding of the average lay person." *Frazier,* 387 F.3d at 1262; *see also King v. Cessna Aircraft Co.*, 03-CIV-20482, 2010 WL 1980861, *5 (S.D. Fla. May 18, 2010). In other words, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at 1262-63 (citing 4 *Weinstein's Fed. Evid.* § 702.03[2][a]). Moreover, where an expert opinion has a tendency to confuse the trier of fact, it may not satisfy the helpfulness prong. *See Frazier*, 387 F.3d at 1258. Finally, "[b]ecause of the powerful and potentially misleading effect of expert evidence," judges must take care not to allow misleading and prejudicial opinions to influence the finder of fact. *See id.* at 1263; *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (citing

*Frazier*, 387 F.3d at 1263).

Here, both of the opinions that XL challenges satisfy the helpfulness test. Calitu's knowledge and training that enable him to opine that the roof membrane would have blown off had it been in its current condition prior to Hurricane Wilma are not universally shared and fall outside the realm of the average person's understanding.[9]   Similarly, most people do not possess the requisite specialized knowledge and training to determine damages to the Property most probably attributable to Hurricane Wilma.  Thus, both of these opinions survive *Daubert*'s helpfulness inquiry.

### III. Conclusion

For the foregoing reasons,  Defendant's Amended Motion to Strike Plaintiff's Expert [D.E. 54] is **GRANTED IN PART and DENIED IN PART**.  To the extent that Defendant's Amended Motion seeks to strike Calitu's opinion that Hurricane Wilma most likely inflicted the damage to the Property, based on Calitu's six-factor chart, the Amended Motion is **GRANTED**.  To the extent that Defendant's Amended Motion seeks to strike Calitu's opinion that Hurricane Wilma most likely inflicted the damage to the Property, based on Calitu's experience and training, the Amended Motion

---

[9]Although the Court has already granted XL's Motion to Strike Calitu's opinion that Hurricane Wilma most likely caused the damage to the Property to the extent that the opinion is based on the six-factor chart, the Court notes that as supported by the six-factor chart, Calitu's opinion should be stricken for the independent reason that it does not meet the helpfulness prong of *Daubert*.  Calitu testified that he obtained five of the factors on the chart from publicly-available information and that he did not employ any special expertise to conduct his analysis. He gathered the information in the sixth row of the chart from witnesses to the damage — a resource that could be brought before the Court by calling such individuals as witnesses.  To the extent that such publicly-available facts and witness testimony were available to the jury, the attorneys could make precisely the same argument that Calitu had.

is **DENIED**.

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 30th day of January 2012.

ROBIN S. ROSENBAUM
United States Magistrate Judge

cc:      Honorable Robert N. Scola, Jr.
         Counsel of Record

21